No. 04-604

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 46

_____

IN RE THE MATTER OF
THE ESTATE OF SUE FORD BOVEY,

          Deceased.

_____

APPEAL FROM:     District Court of the Eighth Judicial District,
                     In and for the County of Cascade, Cause Nos. CDP 88-215, DV 2000-152
                     The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                P. Mars Scott and Ryan A. Harrington, P. Mars Scott, P.C., Missoula,
                Montana

                Alan J. Lerner, Lerner Law Firm, Kalispell, Montana

        For Respondents:

                Arthur G. Matteucci and George N. McCabe, Jardine, Stephenson, Blewett
                & Weaver, P.C., Great Falls, Montana

                James Donahue and Gregory J. Hatley, Davis, Hatley, Haffeman & Tighe,
                Great Falls, Montana

_____

                                 Submitted on Briefs: August 17, 2005

                                   Decided:  March 2, 2006

Filed:

        _____
                        Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     Lisa R.B. Bovey appeals from a judgment entered in the Eighth Judicial District Court, Cascade County, distributing residue of the Sue Bovey Testamentary Trust to Thomas Couch, Patsy Allen, Connie Sisko, Robert Ford Faegre, Shirley Page Faegre, Judy Bistodeau, and Mary W. F. Putnam (hereinafter referred to jointly as ARespondents@).[1]  We affirm.

¶2     Sue Ford Bovey (Sue) died on October 7, 1988; she was survived by her son, Ford Bovey (Ford).  Sue executed a will in 1984, which created a trust for Ford.  The residuary clause of the trust reads as follows:

> Upon the death of my son, Ford, this trust shall terminate and all of the then remaining accrued and unpaid income and all of the then remaining principal of this trust shall be distributed, outright, and free of trust, in equal shares, to my then living heirs-at-law.

¶3     In August of 1993, Ford adopted Lisa Bovey (Lisa), the appellant and daughter of his ex-wife.  Lisa was twenty-five years old at the time of the adoption.  Ford had no natural children.  He died in December 1999.

¶4     Lisa first became acquainted with Ford when her mother, Sharon McGregor (Sharon), began dating Ford in 1979.  In 1982, Lisa, her brother, and her mother moved into Ford's home, in Virginia City, Montana.  Lisa was approximately thirteen years old at this time.  While living with Ford, Lisa=s mother worked full-time for one of Ford=s businesses, and was therefore away from the home much of the time.  Lisa=s relationship with her mother was tumultuous during this period.  In addition, the District Court found that Ford was a heavy drinker and also used, at least from time to time,

---

[1] The Respondents are first cousins once removed from Sue Bovey.

various illicit drugs including cocaine, opium, heroin, LSD and amphetamines. Lisa=s mother testified that Ford=s drinking was Areally bad@ at this time.

¶5 Ford financially supported Lisa during the short period she lived in his house. However, the living situation was far from ideal for a child and was a significant contribution to Lisa=s problems. In December of 1984, after living in Ford=s home for about two years, Lisa was removed from Ford=s home and placed in foster care by the Department of Family Services. On June 3, 1985, she returned to Ford's home, where her mother still resided, but ran away sixteen days later, and was returned to foster care. Lisa never returned to Ford's home during her minority. These foster care placements were made by formal court order. The placement order of July 9, 1985, found that continuing to reside in Ford=s home would be detrimental to Lisa=s welfare, and that she was not under the care and supervision of a suitable adult and had no proper guidance to provide for her physical, moral and emotional well-being. Lisa remained in foster care until she graduated from high school approximately one year later in 1986. Lisa turned eighteen on April 18, 1986. She joined the Navy in the fall of 1988.

¶6 Ford and Lisa=s mother married in July 1986, after Lisa had reached the age of majority. However, Lisa=s mother filed for divorce in 1989 and she and Ford were ultimately divorced in 1997.

¶7 During the 1982-84 period Ford introduced Lisa at times as his daughter and apparently mentioned adoption at times, but took no action in that regard. The District Court found there was no other evidence of Ford=s intent to adopt Lisa until after Sue=s death, in October of 1988. Years later, by 1993 when the adoption took place, Ford

appeared to have developed a certain fondness for Lisa. This affection was demonstrated by Ford=s asking Lisa to come to Arizona, where he lived at the time, to help attend to him after open-heart surgery. Ford also voiced affection for Lisa in statements made to the adoption attorney.

¶8	However, after Sue's Death, Ford repeatedly told trust officer, Tom Ellis, that he intended to adopt someone for the purpose of exercising control over the residue of the trust. He mentioned friends and Sharon's children for this purpose and may have specifically mentioned Lisa in this context. He also told a close family friend of Sue=s that he had adopted Lisa so the Sun River relatives (Couches) would not get his mother=s property when he died.

¶9	This Court reviews the findings of a trial court sitting without a jury to determine if the court=s findings are clearly erroneous. *Tomlin Enterprises, Inc. v. Althoff*, 2004 MT 383, & 12, 325 Mont. 99, & 12, 103 P.3d 1069, & 12. A district court=s findings are clearly erroneous if they are not supported by substantial creditable evidence, if the trial court has misapprehended the effect of evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Albert v. Hastetter*, 2002 MT 123, & 14, 310 Mont. 82, & 14, 48 P.3d 749, & 14. Additionally, in determining whether the trial court=s findings are supported by substantial creditable evidence, this Court must view the evidence in the light most favorable to the prevailing party. *Albert*, & 14. We review a district court=s conclusions of law to determine whether those conclusions were correct. *Albert*, & 14. We will affirm a correct result regardless of the reasoning used by the lower court. *Higham v. City of Red*

4

*Lodge* (1991), 247 Mont. 400, 402, 807 P.2d 195, 196.

¶10    Lisa argues that because she was adopted by Ford she is a descendant of Sue, by representation, under ' 72-2-113(1)(a),[2] MCA, and should therefore inherent the residue of the trust as she is Sue=s only living heir-at-law.  Thus, she is to take the remainder of the trust under Sue=s will.  However, the District Court concluded that because Lisa was not, while a minor, a regular member of Ford=s household, as required by ' 72-2-715, MCA, she was not entitled to the remainder of Ford=s trust.

¶11    As a preliminary matter, Respondents moved to strike Lisa's arguments in her reply brief that ' 72-2-715, MCA, is not applicable here as it was not enacted at the time Sue executed her will, or at the time of her death.  Rule 23(c), M.R.App.P., provides that an appellant's reply brief must be confined to new matter raised in the respondent's brief; thus, an appellant may not raise new issues in a reply brief.  We will not address the merits of an issue presented for the first time in a reply brief. *Pengra v. State*, 2000 MT 291, ¶ 13, 202 Mont. 276, ¶ 13, 14 P.3d 499, ¶ 13.  Nor will we address on appeal an argument not raised in the District Court. *In re Lewis*, 2004 MT 160, ¶ 19, 322 Mont. 13, ¶ 19, 92 P.3d 1218, ¶ 19.  Therefore, Respondents' motion to strike is granted.

¶12    For an adopted individual to be eligible to take by intestate succession, where the decedent was not the adopting parent, she must meet the requirements of § 72-2-715(3), MCA.  The relevant portion states:

---

[2] Section 72-2-113, MCA, states, in part: Ａ(1) ... the entire intestate estate ... passes in the following order to the individuals designated below who survive the decedent: (a) to the decedent=s descendants by representation[.]@

5

> [I]n construing a dispositive provision of a transferor who is not the adopting parent, an adopted individual is not considered the child of the adopting parent unless the adopted individual lived while a minor, either before or after the adoption, as a regular member of the household of the adopting parent.

Section 72-2-715(3), MCA. This Court has not had the opportunity to address this provision of Montana=s version of the Uniform Probate Code.

¶13 The rationale for ' 72-2-715(3), MCA, is set forth in the official comment to the section:

> The general theory of [' 72-2-715(3)] is that a transferor who is not the adopting parent of an adopted child would want the child to be included in a class gift as a child of the adopting parent only if the child lived while a minor, either before or after the adoption, as a regular member of the household of that adopting parent.

The District Court concluded from this language that the intent of the testator was relevant in its determination of whether the adopted child was a regular member of the adopting parent's household. Thus, here, the District Court considered Sue's intent relevant to whether Lisa was a regular member of Ford's household. This is incorrect. By definition, the law of intestate succession determines the intent of the testator. Where it is determined that the child was a regular member of the household of the adopting parent, the legislature has declared that the testator intended for that child to be included in a class gift for children of the adopting parent. Section 72-2-715(3). Therefore, the law supplies the intent of the testator, here Sue, and the court=s only function is to determine the factual issue of whether Lisa, while a minor, was a regular member of Ford=s household. We must then determine what the legislature meant in saying the adoptee is required to be a "regular member of the household of the adopting parent."

¶14 Section 72-2-715(3), MCA, is based on California Probate Code ' 21115(b) (formally Cal. Prob. Code ' 6152). Section 72-2-715(3), MCA, official cmt. Therefore, the commission comments to the California Code, and the policy noted in several California cases are helpful in our determination.

¶15 The commission comment to Cal. Prob. Code ' 21115 states, ASubdivision (b) [the equivalent of Subsection 72-2-715(3), MCA] precludes the adoption of a person (often an adult) solely for the purpose of permitting the adoptee to take under the testamentary instrument of another.@ This policy has been followed by the California courts. In *Estate of DeLoreto* (2004), 118 Cal.App.4th 1048, the appellate court held that two adopted adult children, while minors, were not Aregular members@ of the adopting parent=s household, under Cal. Prob. Code ' 21115(b). *DeLoreto*, 118 Cal. App.4th at 1052-1053. The *DeLoreto* court stated that the statute should be strictly construed so as to discourage Aadoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.@ *DeLoreto*, 118 Cal.App.4th at 1054. [3]

¶16 The same policy was recognized in *Pittman v. Goris* (1980), 104 Cal.App.3d 288, where the court dealt with a similar situation prior to California=s codification of its present statute. In *Pittman*, the court stated that generally children who are adopted as adults should be excluded from class designations of Achildren@ or Achildren of children.@ *Pittman*, 104 Cal.App.3d at 294. However, an exception should be recognized as to Aadult adoptees who had actually been taken into the adoptive parent=s

---

[3] We cite to this case for its policy only, as we recognize that the facts of the case are distinguishable from those here.

7

home and family as minors and who were reared by the adoptive parent . . . .@ *Pittman*, 104 Cal.App.3d at 295. The *Pittman* Court further reasoned that adult adoptees coming within the exception should be deemed to fall within the class Aunless it is shown that the purpose of the adoption was to diminish or defeat the income and remainder interests of other beneficiaries >for purposes of financial gain or as a spite device.=@ *Pittman*, 104 Cal.App.3d at 295 (quoting Oler, *Construction of Private Instruments Where Adopted Children Are Concerned* (1945), 43 Mich.L.Rev. 901, 938).

¶17     We conclude that being a regular member of the household of the adopting parent requires more than simple residence for a time at the adopting parent's home. The underlying policy of subsection (3) is to limit the ability of the adopting parent to circumvent the testamentary intent of another. It is less likely that the individual was adopted as a means of circumventing the intent of the testator if the adopted individual, while a minor, had some familial relationship with the adopting parent. Or, as the California court articulated it, the adoptee should have been Ataken into the adoptive parent=s home and family as [a] minor[] and . . . reared by the adoptive parent[.]@ *Pittman*, 104 Cal.App.3d at 295. This is further supported by the statute's use of the terms "member" and "household," and not simply "residence" or "reside." This language evidences the legislature's intent that the relationship between the two parties constitutes something beyond that of simple residence.[4]

---

[4] The notion that being a regular member of the household, under § 72-2-715, MCA, requires more than mere residence at the adoptive parent's home, is further evidenced by the commission comment to the California code. The comment states that the statute is included to "preclude the adoption of a person (*often an adult*) solely for the

¶18     In this case, the District Court found no such relationship between Ford and Lisa while she was a minor.  Specifically, the District Court found that:

> [Lisa=s] stay in Ford=s house was relatively short - about two years.  Lisa was already a teenager.  It can hardly be said that [Ford] Areared@ her.  It appears he seldom was in the house during his waking hours.  Ford and Sharon [Lisa=s mother] were not married at the time.  Lisa was only there because her mother was there.  When that relationship [with her mother] broke down, she left.  Whatever the relationship between [Lisa] and Ford might have been, nothing about it deterred Lisa=s departure.  In fact, what she was hearing about him and possibly his drinking contributed to her wanting out.  During her stay with him, she had three suicide attempts.  She was ultimately adjudicated a dependant youth -Athat she has no proper guidance to provide for her necessary physical, moral, and emotional well being[.]” . . .
>         It cannot be said that Ford stood in the relationship with Lisa of “in loco parentis.@  [quoting *Pittman*, 104 Cal.App.3rd at 295].  [5]

The record supports the District Court's finding of fact that no relationship existed between Ford and Lisa during her minority sufficient to indicate she was a regular member of Ford=s household as required by ' 72-2-715(3), MCA.

---

purpose of permitting the adoptee to take under the will of another.@  Cal. Prob. Code ' 21115, commission cmt. (emphasis added).  The parenthetical language indicates that the statute also applies to situations where a minor may be adopted solely for the purpose of permitting the minor to take under the will of another.  It would be irrational to assume that in such a situation a court may rely solely on that fact that the minor stayed for a time at the adoptive parent's home to conclude the minor was a regular member of the household, under § 72-2-715, MCA.  Under this rationale the reason for the minor's presence would be entirely irrelevant.  Such was not the intent of the legislature.  The court must be permitted to examine the relationship between the two parties and conclude whether such relationship was conducive to that required under the statute, that of a household, a familial relationship.

[5] Poor parenting, complicated by drug and alcohol abuse, would not necessarily eliminate a child's eligibility as a regular member of the household of an individual who later wishes to adopt the child.  However, where such problems virtually bar any relationship with the child, as is the case here, such are valid considerations in assessing whether the adoptee was a regular member of the household.

¶19 In addition, given the underlying policy of ' 72-2-715, MCA, a finding that the purpose of the adoption was to diminish or defeat the income and remainder interests of other beneficiaries for purposes of financial gain or as a spite device, should be considered in our determination. *See* ' 72-2-715, MCA; *see also DeLoreto*, 118 Cal.App.4th at 1054 (Astrict application of ' 21115 will not discourage adoptions consummated for the proper reasons of love and respect . . . [i]t will only discourage adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.@). After hearing the witnesses and considering all the evidence, the District Court determined:

> That Ford had a motive of defeating the inheritance by blood relatives and substituting himself as the one to determine where the [residue] would go, is abundantly clear. Though able, he did not adopt Lisa while she lived in his home or at the crucial time when the youth in need of care proceedings were going on and she needed a parent. He didn=t adopt her at the time of his marriage to Sharon. He had many conversations with trust officer Ellis about controlling the residue by adoption and who he might adopt. It appears that he may have considered a variety of potential candidates. . . . He did not adopt Sharon=s other children though it is typical for a stepparent to adopt all of the children of his spouse. . . . [W]ithout the trust, there would have been no adoption.
> In effect, Ford attempted to exercise a power of appointment that was never granted to him by Sue.

¶20 There is substantial evidence in the record to support the findings of the District Court. Any evidence surrounding Lisa's stay with her mother at Ford=s residence, and any incidental relationship that may have existed, is outweighed by the lack of any familial relationship between the two while Lisa was a minor, and because Ford=s true intent in the adoption to circumvent Sue's will. Based on these findings, for the reasons

10

stated above, we conclude that as a matter of law Lisa was not, while a minor, a regular member of Ford=s household. Thus, pursuant to ' 72-2-715(3), MCA, Lisa is not considered an heir at law of Sue Bovey.

¶21    The judgment of the District Court is affirmed.


                                        /S/ JOHN WARNER


We Concur:


/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice Jim Rice dissenting.

¶22  The painful implication of today's decision is that the troubled nature of a teenager's years within a home can render her relationship with her adoptive father "insufficient" to take from an estate as his child.  *See* ¶ 18.  I disagree that the law requires such a holding.

¶23  The Court does not justify its decision as necessary by reason of the facts.  The opinion is not fact-driven.  Indeed, except for a brief reference that "the record supports" the findings of fact, the opinion is premised entirely on an analysis, which I believe to be flawed, of policy considerations.  *See* ¶ 13 ("[t]he rationale of § 72-2-715(3), MCA, is set forth in the official comment"); ¶ 14 ("the commission comments to the California Code, and the policy noted in several California cases are helpful"); ¶ 15 ("[t]his policy has been followed by the California courts"); ¶ 16 ("[t]he same policy was recognized in *Pittman v. Goris*"); ¶ 17 ("[t]he underlying policy of [§ 72-2-715(3), MCA] is to limit the ability of the adopting parent"); ¶ 19 ("given the underlying policy of § 72-2-215, MCA").

¶24  Although I believe this case should be decided by a straightforward application of the law to the facts, I turn first to the Court's policy analysis.  The Court has over-played the policy background, which does nothing more than explain why this statute was enacted in the first place:  "[to preclude] the adoption of a person (often an adult) *solely for the purpose* of permitting the adoptee to take under the testamentary instrument of another" (¶ 15, emphasis added); and "*generally* children who are adopted as adults should be excluded from class designations" (¶ 16, emphasis added).  The uniform act

was drafted and adopted by our Legislature to codify this policy. Section 72-2-715(3), MCA, incorporates the policy by setting forth the general rule–that children adopted as adults are excluded from intestate succession. But the statute does not end there; it incorporates a narrow exception to that general policy for those adopted adults who lived "while a minor" as a "regular member of the household of the adopting parent." Section 72-2-715(3), MCA.

¶25     The Court attempts to stretch the policy considerations which drove the enactment of the general rule into a directive to interpret narrowly the rule's already narrow exception. I submit that the authority it offers for this policy extension does not support such an interpretation.

¶26     First, the Court offers *In Re Estate of DeLoreto* (2004), 118 Cal. App.4th 1048, 1054, for the proposition that "the statute should be strictly construed so as to discourage 'adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.'" ¶ 15. In *DeLoreto*, the testator bequeathed income to his three children and the corpus to his grandchildren. About twenty years after the testator's death, one of his sons adopted two adults, who were also his deceased wife's niece and grandniece. Neither of these in-laws of the son had ever resided with him or his deceased wife. "Each, during her entire minority, was a regular member of her natural parents' household, was supported by her natural parents and never looked beyond her natural parents for lodging or support." *DeLoreto*, 118 Cal.App.4th at 1052.

¶27     The adopted adult in-laws argued that the uniform act "should be liberally construed to include close family members who resided while minors as regular members

14

*of an in-law's household.*"  *DeLoreto*, 118 Cal.App.4th at 1054 (emphasis added).  It was in the context of denying the in-laws' request to expand the statute to persons far beyond its plain wording that the *DeLoreto* court said that "strict application of [the statute] . . . will . . . discourage adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators."  *DeLoreto*, 118 Cal.App.4th at 1054.

¶28     The Court distances itself from *DeLoreto*'s obvious distinctions by stating it is relying on *DeLoreto* "for its policy only," but its references to *DeLoreto* for "strict application" of the statute are misleading for two reasons:  (1) *DeLoreto* used "strict application" to reject expansion of the statute to adopted adults who had never resided with the adopting parent (not the issue here); and (2) the "strict application" rule was <u>not</u> used by *DeLoreto* to require a narrow interpretation of the exception allowing adopted children to demonstrate their membership of the household as minors (the issue here).

¶29     The Court next asserts that the "same policy" noted in *DeLoreto* was also recognized in *Estate of Pittman v. Goris* (1980), 104 Cal.App.3d 288.  *Pittman* enunciated a common law rule which was similar to what would become the uniform act. It first held, similar to the general rule of our statute, that "generally the exclusion of adult adoptees from class designations . . . established in pre-1951 wills probably best comports with the inferred intention of the testator . . . ."  *Pittman*, 104 Cal.App.3d at 294-95.  Also like our statute, it then crafted an exception to the general rule for adult adoptees "who had actually been taken into the adoptive parent's home and family as minors and who were reared by the adoptive parent in 'loco parentis.'"  *Pittman*, 104 Cal.App.3d at 295.  The *Pittman* court explained that this exception "would most closely

accord with the pattern of personal relationships a testator would envision as coming within the class designations . . . ." *Pittman*, 104 Cal.App.3d at 295.

¶30 Again, however, the "policy" alluded to in *Pittman* was for the purpose of adopting the rule itself, not to guide an assessment of the relationship between the adopting parent and the child. Poignantly, *Pittman* was decided on factual grounds—that "no evidence" was introduced that the adult adoptees had ever lived with the adopting parent as minors. *Pittman*, 104 Cal.App.3d at 295. Forced to decide the case on the record, the *Pittman* court nonetheless outlined the potential which the case had held:

> All that is shown by the petition for instructions was that the men were adopted as adults. In the reporter's transcript of the hearing below, however, we note that in respondents' counsel's oral argument, he states that the adoptees were stepchildren of Hubert Lloyd; that they were taken into his home in their early teens when Lloyd married their mother; that they were reared in the Lloyd home, left for the service, returned to the home after the service and left on the occasion of their marriages. There also appears to be acquiescence on the part of one of appellants' attorneys that the represented state of affairs did exist. Counsel's argument, however, is not evidence in the case and cannot be relied upon to support the trial court's order.

*Pittman*, 104 Cal.App.3d at 295. It is difficult to miss the similarities between these facts and the facts in the case before us, to which I now turn.

¶31 Sharon McGregor, Lisa's mother, moved with her family to Virginia City in 1979 following the dissolution of her prior marriage, as noted in the District Court's findings. The court's findings, however, do not discuss the evidence of the parties' relationship before they began living together. According to Sharon's testimony, about four months after her move to Virginia City, Ford and Sharon became acquainted and he began asking her to date. Initially, Sharon demurred, as she felt she was not yet ready for a

relationship. Eventually, she began dating Ford, but even then "my children were my priority." Thus, the couple dated over the next couple years, during which time Ford "included my children in our activities, going to the lake, going skiing, going to movies in Bozeman, going to dinner. He always included them," according to Sharon. She further testified that, during this time before they lived together, Ford expressed his positive feelings toward her children and that:

> You know, Ford, he bought them, he liked to buy imaginative toys, the large toys. He bought them things like that. I know he bought them birthday presents and he bought them Christmas presents, plus, you know, the gifts of ski packages, things like that.

About two years after they met, Ford took Sharon and her two children, Lisa and Torrey, on a month-long winter trip to Hawaii. During the trip, which Sharon used to measure the group's ability to get along, Ford did very well with the children and helped them complete a month's worth of homework assignments:

> And amazingly enough, it was Ford that was the real enforcer, you have to do homework. And he would sit up until late at night helping them. He was very patient with them. He was like, he treated them like his children, like he would if it was his very own children.

Following their return from Hawaii, Sharon gave serious consideration to Ford's offer for her family to move in with him, and consulted with the children:

> Q. How come you didn't move in the first time that he asked you?

> A. I had to talk to the children. You know, we had this trip. We had to see how we got along. We talked about it. And I had to like, you know, just sort of ask them how they felt about everything, you know, we were there more than at home. And we just had to all sit down and it took more than an hour, or one evening. We talked about it for a couple weeks at least, maybe more.

Q. Did you discuss with Ford the fact that you needed to make sure that the children approved?

A. Oh, yes.

Q. What did he say about that?

A. He thought that was great. He wanted the kids to have a say-so in it.

Q. Did you talk to the children about moving in?

A. Yes, I did.

Q. What was their response?

A. At that point they were happy to. They were getting along great with Ford. They liked the idea. And they also didn't like to be alone a lot. They wanted people around them. You know, having somebody there in the evening is good, and having somebody cook for them so they don't have to cook for themselves, they thought that was great.

Q. And did you think that this was a good thing for your children?

A. I did. I thought about it very carefully. And like I said, I wouldn't have moved in if the children hadn't agreed to it also.

Thus, about six months after returning from the Hawaii trip, Sharon and her family moved into Ford's house. The District Court, of course, could not make a finding on every detail, but its two-sentence review of the parties' relationship prior to living together does not adequately illustrate that the move-in was preceded by a two-and-a-half-year relationship. Lisa was eleven when Sharon began dating Ford and was thirteen when she moved with her family into Ford's house. The move was a deliberate decision which was preceded by a lengthy friendship, including one between Ford and Lisa.

¶32    In preparation for the move-in, Ford had his house remodeled to create two new bedrooms, one for Lisa and one for Torrey. The house formerly had only one large

18

bedroom, which was occupied by Ford and Sharon, but was expanded to accommodate the children's needs. Further, Ford took an active role in providing for the children in various ways:

Q. And so when you moved into Ford's house, and Lisa and Torrey moved in with you, did you pay rent or pay any expenses?

A. No, I didn't. Ford took care of everything.

Q. When you say took care of everything, what does that mean?

A. Well, children need food, they need clothes, they need school clothing, they always need new shoes, they need new coats because it's cold there. They need school supplies. They need medical and dental.

And there was always something coming up, and it's a lot of money. And Ford took care of all of that. We talked about it. He wanted to do that and he said he would do that.

Q. And he said he would pay for those kinds of expenses?

A. You know, we didn't discuss specifically, you know, are you going to pay for this. Ford knew what it took to take care of children. I mean, he already knew. And so like when a dental thing came up, there was no question that, you know, Ford would take them to the dentist. And we didn't really discuss it. Ford just knew that he was going to take care of things like that.

Q. And you knew that he was going to do that?

A. I did. Because I knew how he felt about them.

Q. And did Lisa need dental work?

A. Yes, she did.

Q. What did she need?

A. She had toothaches. We thought she needed braces. He told her he would get her braces if she needed them. And just fillings and maintenance. But she had to have a root canal at one point. And you need to, Ford took care of all of that.

19

Q. Do you have any idea how much Ford spent on those kind of expenses, on the dental expenses?

A. Thousands.

Q. Over $1,000?

A. Oh, yes.

Q. Did he ever complain about having to pay that?

A. Never.

Q. Did he ever complain about having to pay any expenses that you just recited for the children?

A. Never did. In fact, when the children had to go ask for it, because I would not have the money, he seemed really pleased that, you know, that they had to come to him and that he could say, oh, yeah, sure I'll get you that pair of shoes, or I'll take care of this and that. I mean, he was happy to do it.

Q. Happy to do it?

A. With what he, he seemed to just beam when Lisa would go, my tennis shoes have a big hole or I ripped my jeans [on] the fence, I need a new pair of jeans. And he'd go, when do you want to go? Or can your mom drive you?

And he seemed happy that he could like do that. He was like sure, I'll get you that. And he would have her show him the shoes. Show me your shoes. And he'd go, yeah, you need new shoes. He did that with everything.

¶33 Lisa lived in Ford's house with her family for two years. She thereafter attempted suicide on three occasions in 1983-1984, was adjudicated a youth in need of care in 1985 and left town when she graduated from high school in 1986.

¶34 The District Court acknowledged that certain findings "weigh in favor of Lisa such as living in Ford's house for a period of time, the fact that he apparently at the time

referred to her as his daughter and mentioned adoption, that he taught her some skills and the fact that he supported her during the time she was there." However, the court ultimately concluded that "[i]t cannot be said that Ford stood in the relationship with Lisa of 'in loco parentis.'"

¶35 With all due respect, the statute does not require that Lisa prove that she and Ford had established a relationship in the nature of a child-parent relationship. It merely requires that Lisa was a "regular member of the household." The statute requires a decidedly more objective review of "cold" facts surrounding Lisa's living situation than the demonstration of a parental relationship, as undertaken by the District Court, would require. When the facts are viewed under the statute's plain words, a different conclusion is compelled than that reached by the District Court.

¶36 Lisa first became acquainted with Ford during the two-year period that preceded living with him. She was part of family discussions and a family decision to move in with Ford which was intended to be a permanent relocation of the family. Ford remodeled his house to provide a bedroom for her. He provided food, clothing, medical care, transportation, recreation and gifts to her. These facts are essentially undisputed. Ford was a troubled man, Lisa was a troubled teenager, and the nature and extent of his contribution to her overall well-being is certainly arguable. Quite possibly he was more of a detriment than a help during her teenage years. However, this should not change the outcome. The things which Ford did for Lisa are those which are done only for one who is a regular member of the household.

¶37 A word about the policy underlying the statute. First, while Ford no doubt had mixed motives, it cannot be said from this record that Ford's adoption of Lisa was "solely for the purpose" of permitting Lisa to take from her grandmother's estate. As the District Court found, Ford discussed adoption of Lisa while she was a minor. Secondly, a consideration of policy should include the thought that children who are adopted often do not come into the household at birth. Often times they arrive as stepchildren or foster children, perhaps as teenagers, and their time in the household before departing as an adult is often short. The statute does not penalize them for this time disadvantage, and we should not either. Thus, I believe Lisa's claim is not undermined under these circumstances by the relatively short duration, two years, of her stay in the household.

¶38 I would reverse.


/S/ JIM RICE


Chief Justice Karla M. Gray joins the dissent of Justice Rice.

/S/ KARLA M. GRAY